JAMES W. ROBINSON v. THE DETROIT, LANSING &
NORTHERN RAILROAD COMPANY.

*Contract—Settlement.*

This case involves the question of the effect of the acceptance by
the plaintiff of a check for the amount claimed by the defend-
ant to be due him for ties furnished the defendant as per a
statement accompanying the check, and which plaintiff
receipted, but on the same day sent defendant a protest against
the inspection upon which the account was based. And it is
held that the whole question as to whether it was a conclusive
and binding settlement was properly left to the jury, and the
judgment in favor of the defendant is affirmed.

Error to Montcalm. (Smith, J.) Argued February 6,
1891. Decided February 27, 1891.

*Assumpsit.* Plaintiff brings error. Affirmed. The
facts are stated in the opinion.

*George S. Steere,* for appellant.

*McGarry & Ford* (*C. B. Lothrop,* of counsel), for
defendant.

CHAMPLIN, C. J. This is an action upon the common
counts in *assumpsit,* commenced by declaration, to recover
from the defendant the value of certain ties sold and
delivered to it by the plaintiff. The plea was the general
issue.

In 1886 the plaintiff sold and delivered to the defend-
ant a quantity of railroad ties, under a written contract
entered into on June 1, 1886, in which the plaintiff
agreed to deliver to the defendant on or before July 1,
1886, 800 ties, according to the following specifications,
namely:

"Ties to be made from white oak, burr oak, and hemlock; to be cut from sound, live timber, eight feet long, six inches thick, to an even and parallel thickness, neatly and carefully hewn with the broad-axe, and ends sawed square; to be delivered upon the right of way of the company at or above grade, at a distance of not less than eight feet from the nearest rail, in cross-piles, with ties six inches apart, and owner's name plainly marked on each pile. Each pile must be entirely separate, so as to allow inspection on all sides; all piles to have at least two feet interval from other piles or fences."

"The following specifications, with the above, will govern inspection: No. 1, hewed or slabbed oak ties, cut two from a log, commonly known as 'string ties,' nine inches or upwards face on both sides, with bark all removed,—a first-class tie in every respect; No. 2, hewed or slabbed oak ties, similar to the above in every respect, seven to nine inches face; No. 3, sawed oak ties, seven inches face, squared up; No. 4, hewed or slabbed hemlock ties, one from a log, nine inches or upwards face on both sides,"—for which the railroad company agreed to pay Robinson as follows: "No. 1 oak ties, 40 cents each; No. 2 oak ties, 40 cents each; No. 3 oak ties, 35 cents each; No. 4 hemlock ties, —— cents each; ties to be inspected and paid for monthly, less 10 per cent., which will be retained on all payments until the completion of the contract, which 10 per cent. will be forfeited in case of failure to complete the contract."

This contract was filled by Robinson, and the ties paid for by the company.

In the year 1887, the plaintiff claims that he entered into another contract with the defendant, through its timber agent, a Mr. Wiley, for putting in 5,000 ties, under the same specifications as of those which were furnished in 1886, and, in addition to those, the plaintiff claims that he made a verbal contract with Mr. Wiley to take all the ties he could put in until November 1, 1887. The plaintiff claims that under his contract made with the defendant through Mr. Wiley in 1886 he delivered red-oak ties, which were accepted by Mr. Wiley as No. 1 ties, and paid for accordingly, and that he had the same

understanding with him with reference to the contract which he entered into in 1887. It appears from the undisputed testimony that Mr. Wiley had no authority from the defendant company to vary these specifications for ties, and had no authority to accept red-oak ties for the company. A large number of ties were delivered along the line of the defendant's road during the year 1887, under the contract made with Mr. Wiley, the timber agent, but, before they were inspected and accepted by the defendant, Mr. Wiley resigned his position, and Mr. Petheram was appointed in his stead.

The plaintiff testified, and the testimony is undisputed, that the ties which he put in during the year 1887 were subject to inspection by the defendant company. Some dispute arose between the plaintiff and the defendant company with reference to the quality of the ties which he had delivered along the road under his claimed contract with Mr. Wiley. The company refused to accept or to inspect the red-oak and split ties as No. 1 ties, but insisted that they were of the grade of culls. Thereafter the following correspondence was had between Mr. Robinson and Mr. Mulliken, and between Mr. Robinson and Mr. Petheram: A letter of January 20, 1888, from Mr. Robinson to Mr. Mulliken, is a request for the inspection of the ties. The letter from Mulliken to Robinson, of January 24, in reply, states that—

" All written contracts for ties or other material made by Mr. Jefferson Wiley will be carried out to the letter, but he had no authority to make verbal arrangements, and we shall not recognize such. We will, however, take all ties that are made in conformity with our specifications for this year at such prices as may be agreed upon between the parties furnishing them and our present lumber agent, Mr. J. W. Petheram."

A letter of January 26, from Robinson to Mulliken, in reply to his of the 24th, states that—

"My contract with Mr. Wiley is written, not verbal. The prices specified are forty-five cents for No. 1 oak ties, forty cents for Nos. 2 and 3. In addition to these he contracted to give me a margin above this for all I could get out up to November 1. As I have had considerable money wrapped up in these ties for the last three months, I should be glad to meet Mr. Petheram very soon."

A letter from Mr. Robinson to Mr. Petheram, of February 9, relates to the ties which were gotten out after November 1, 1887, and also containing the following:

"I wish to ask you to allow us a fair price for red oak. Those ties are worth more than hemlock ties, and no fault of ours that they are out, as I, in common with others, thought the company wanted them. There are some who put in such ties on my contract. These parties paid five cents per tie for the timber, eight cents for sawing, two cents for hauling to the track, besides the labor of hauling them from the woods. I am not paying more than I get for them, yet the company is a gainer by having them for ten cents. It is a hardship to many of these poor men who have been misled."

A letter of February 13, from Robinson to Petheram, expresses a wish to contract for 5,000 oak ties, and a request that he send copies of specifications, so that there will be no excuse for mistakes. A letter of February 16, written by Petheram to Robinson, acknowledges the receipt of Robinson's letters of February 9 and 13, relative to ties, stating that his instructions were from the general manager to take ties that were on the track previous to November 1, and saying:

"The only arrangement I will make about ties with you is this: I will inspect ties that I am assured were delivered previous to November 1, and apply on old contract, but I will not inspect and apply on old contract ties that I have positive proof were not so delivered. Ties that have been delivered since that time I will inspect, subject to our present specifications, at a rate to be agreed upon between you and myself, namely, thirty-

eight for No. 1, twenty-eight for No. 2, and thirty-three for No. 3; but these prices or agreements will not be carried out unless accepted by Tuesday, the 21st inst. I may be at Vestaburg on that day. Regarding the R. R. ties, they are culls. It has been the custom to pay ten cents for culls. Ten cents may be paid for these culls, or I may decide not to take them at all. Oftentimes men put on ties reserving the culls. As to tie-makers. having been misled, they are generally the parties who try to do the misleading, and red-oak ties are what they use for the purpose of so doing."

A letter of February 20, from Robinson to Petheram, reads as follows:

" *Dear Sir:* In reply to yours of recent date, I appeal to you in behalf of some men who put in the red-oak ties for what it seems to me to be justice, when we consider the D. L. & N. has taken those red-oak ties for years at white-oak prices. At the same time I expected your decision would be final, so I accepted it."

After referring to some other matters, he concluded his letter as follows:

"I hope you will come Tuesday, as I want my ties inspected, and need the avails."

The ties were inspected, and a statement thereof and a check dated March 14, 1888, for $2,689.74, payable to Mr. Robinson, were delivered to and accepted by him. The statement referred to, attached to the check, reads. as follows:

"D. L. & N. R. R. Co.,
"To J. W. Robinson, Dr.    March, 1888.
"Business address, Vestaburg, Mich.
March 7.

| | |
|---|---:|
| For ties, No. 1 white oak, 1,180 ties, at forty-five cents | $ 531 00 |
| No. 2 white oak, 2,143 ties, at forty cents | 857 20 |
| Culls, 6,990, at ten cents | 699 00 |
| Total | $2,087 20 |

"For G. R. L. & D., material account.  Paid February, 1888.
"H. B. SEAGRAVES, S. K.
"Approved, J. B. MULLIKEN, General Manager.

"VESTABURG, March 15, 1888.
"Received, D. L. & N. R. R. Co., $2,087.20, in full of above account,"—

To which Mr. Robinson added the words "on account," and signed the voucher. On the same day, and after receiving the check, Mr. Robinson sent the following written protest to the defendant:

"VESTABURG, MICH., March 15, 1888.
"To THE D. L. & N. R. R. Co.:

"I protest against Mr. J. W. Petheram's inspection, or Parmelee's, of the oak ties gotten out as per agreement with Mr. Wiley as unjust and unfair to me, inasmuch as I claim a margin on said ties that was promised me by said Wiley.                         J. W. ROBINSON."

This suit is brought to recover the value of the red-oak and split ties, which Petheram rejected as culls. Two special questions were submitted to the jury:

"1. Were the ties described in Wiley's letter of August 16, 1887 ['*Dear Sir:* Answering yours of August 15, I would say the prices I will allow you in the future will be: For No. 1, forty-five; for No. 2, forty; No. 3, forty cents'], as No. 1's, 2's, and 3's, intended by the parties to be same grades as were described by like numbers in the written contract under which plaintiff had previously furnished ties?

"*A.* No.

"2. *Q.* Was the inspection of the ties in question made by Petheram and Parmelee in pursuance to the following correspondence: Letter from Robinson to Mulliken, January 20, 1888; letter from Mulliken to Robinson, January 24, 1888; letter from Robinson to Mulliken, January 26, 1888; letter from Robinson to Petheram, February 9, 1888; letter from Robinson to Petheram, February 13, 1888; letter from Petheram to Robinson, February 16, 1888; letter from Robinson to Petheram, February 20, 1888?

"*A.* Yes."

The plaintiff made no requests of the court to instruct the jury, and the court, in his charge to the jury, presented the claims of the parties as developed by the testi-

mony in a very plain and impartial manner, fully as favorable to the plaintiff as the testimony would warrant, and the jury found a verdict of no cause of action.

The case is brought here upon writ of error, and 21 errors are assigned. Nine of them relate to the rulings of the court upon the admission or rejection of testimony. We discover no error in the rulings upon these points. The balance of the errors assigned relate to the charge of the court. It will be a needless waste of time to embrace the charge of the court and the exceptions to it in our opinion, as it laid down the rules of law correctly under the testimony in the case. The court instructed the jury that—

"There are some letters in evidence by both Petheram and Robinson, by Robinson to Petheram and by Petheram back to Robinson, in regard to that inspection. You have those letters before you, the situation of the parties, and what was done, and from all that evidence I leave that as a question for you to settle: Did Robinson consent to be governed by Petheram's inspection? If he did, that ends this case. He cannot recover."

The jury found specially, as before stated, in answer to the second question, that the inspection of the ties in question was made in pursuance of that correspondence.

The fifteenth assignment of error is as follows:

"The court erred in instructing the jury in said cause, as follows:

"'Now, gentlemen, had that bill of the—as to these ties, the different quantities, been forwarded to the general office at Detroit, or wherever it may be, to the general manager, and he had sent back the bill to Mr. Robinson, and sent a check for the payment of the bill based upon that inspection, and the bill had been forwarded to him for that amount, and Mr. Robinson had received it without any protest or objection, and receipted in full for the ties, I think that he would be bound by it; that should be treated as a receipt in full; that he could not recover more, as the evidence is in this case, without showing

that there was any duress, or anything to show that he was obliged to act as he did.'"

Regarding the fifteenth assignment of error, the counsel for the plaintiff states that the court in effect charges—

"That the acceptance of a check in full settlement of account to date, based upon that inspection, would be a bar to the plaintiff's action, unless plaintiff had saved his rights by proper objection and protest, or had been under duress, etc.," and he insists that "this is in direct conflict with the decision of this Court in the case of *Mortlock v. Williams*, 76 Mich. 568, in which case the question was squarely raised, and in a very clear opinion by Justice LONG it is held that the acceptance of such a check would be no bar."

The case of *Mortlock v. Williams* is very different from this. In that case the court passed upon the effect of the receipt, and took the case from the jury; but in this case, following the instruction quoted in the assignment of error, the court continued his charge as follows:

"But, under the circumstances of the case, I submit that to you. You have what Mr. Robinson did at the time, as shown by the evidence in this case; you have the way he says he received the check, what he wrote upon the receipt; the paper, so-called protest, that he gave to the agent at Vestaburg, and all the other evidence in the case that bears upon that question. Was it received by Robinson as a settlement of his claim against the railroad company? It is perfectly competent for persons having disputed rights to go and settle, and, if they do, it is binding. If these propositions are found in favor of the plaintiff's claim, then comes the question as to the value of the ties accepted."

Thus it is seen that the whole question as to whether it was a conclusive and binding settlement was left to the jury to determine, under the circumstances of the case.

We find no error in the record, and the judgment is affirmed.

MORSE, McGRATH, and GRANT, JJ., concurred. LONG, J., did not sit.